**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**FLINT TIMOTHY BUSH,**

      **Plaintiff,**

**vs.**                                **CIVIL ACTION NO. 2:19-CV-00310**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered April 25, 2019 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 10, 11)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand (ECF No. 10), **GRANT** Defendant's request to affirm the decision below (ECF No. 11); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from the docket of this Court for the reasons stated *infra*.

<u>**Procedural History**</u>

1

The Plaintiff, Flint Timothy Bush, (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on February 4, 2016, alleging disability since September 14, 2013[1], because of "sarcoidosis, gout, HBP, high cholesterol, [and] subtotal thyroidectomy due to thyroid cancer."[2] (Tr. at 207-209, 210-211, 236) His claim was initially denied on April 8, 2016 (Tr. at 129-139) and again upon reconsideration on June 17, 2016. (Tr. at 141-147) Thereafter, Claimant filed a written request for hearing on June 17, 2016. (Tr. at 148-149)

An administrative hearing was held on May 2, 2018 before the Honorable Nathan Brown, Administrative Law Judge ("ALJ"). (Tr. at 81-106) On May 23, 2018, the ALJ entered an unfavorable decision. (Tr. at 35-52) On July 19, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 204-206) The ALJ's decision became the final decision of the Commissioner on February 28, 2019 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On April 23, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (ECF No. 10), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 11), to which Claimant filed his Reply (ECF No. 14). Consequently, this matter is fully briefed and ready for resolution.

---

[1] The alleged onset date was subsequently amended to July 30, 2015. (Tr. at 212-213)

[2] Claimant alleged he stopped working on September 14, 2013 but he stopped working "[b]ecause of other reasons" – "[t]he plant shut down", however, he asserted that his conditions became severe enough to prevent him from working as of July 30, 2015. (Tr. at 236) In his Disability Report – Appeal, submitted on May 6, 2016, Claimant alleged that he experienced "[i]ncreased depression, dizziness, shortness of breath and weight gain." (Tr. at 272) In a subsequent Disability Report submitted on June 20, 2016 after the reconsideration level of review, Claimant asserted that as of May 1, 2016, he had developed "diabetes, A-fibrillation." (Tr. at 279)

**Claimant's Background**

Claimant was 57 years old as of the alleged onset date and considered a "person of advanced age" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(e). (Tr. at 107, 117) Claimant has a high school education and had worked as machine operator/box spring cover maker for over 25 years until the plant closed down, he then went to college, but had discontinued the college courses when he was diagnosed with cancer. (Tr. at 88-89, 237)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through June 30, 2019. (Tr. at 40, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of July 30, 2015. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: left shoulder degenerative joint disease; sarcoidosis; and obesity. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 41, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work

> except he can frequently reach in all directions, including overhead with the left arm. He can climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; kneel and crouch frequently; and crawl occasionally. He can work at unprotected heights occasionally; with or around moving mechanical parts frequently; in humidity and wetness occasionally; in dust, odors, fumes, and pulmonary irritants frequently; and in extreme cold or extreme heat occasionally.

(Tr. at 42, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 46, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from July 30, 2015 through the date of the decision. (Tr. at 47, Finding No. 11)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

In support of his appeal, Claimant asserts two main grounds of error.

First, Claimant argues that the ALJ's RFC assessment is deficient insofar as the ALJ failed to account for Claimant's chronic fatigue that resulted from his severe impairment, sarcoidosis, a symptom that is amply supported by the medical record as well as Claimant's own statements and testimony. (ECF No. 10 at 5-8) Claimant asserts that the ALJ did not consider how his chronic fatigue would allow for him to complete a full workday; this lack of analysis and explanation frustrates meaningful review. (Id. at 8-10)

Next, Claimant contends that the State agency consultant, Jose Gonzalez-Mendez, M.D., opined that Claimant was limited to light work which was consistent with the evidence of record, however, in assigning less weight to this opinion, the ALJ failed to provide an adequate explanation as to what evidence supported the ALJ'S conclusion, and instead relied upon cherry-picked facts taken out of context. (Id. at 10-12) Claimant states that this error is not harmless given Claimant's vocational profile, because Dr. Gonzalez-Mendez's physical RFC limiting him to light work would render Claimant disabled pursuant to Medical-Vocational Rule 202.06. (Id. at 12)

Claimant requests this Court to remand to correct these errors. (Id. at 13)

In response, the Commissioner states that in his assessment of the RFC, the ALJ considered all the relevant evidence, and with respect to Claimant's sarcoidosis, this included the medical evidence, Claimant's hearing testimony concerning his gym attendance and that he could lift 50 pounds, as well as Claimant's subjective complaints of fatigue. (ECF No. 11 at 7-9) The Commissioner also contends that the ALJ properly evaluated the medical opinions of record and explained the weights he gave them: this included two State agency consultants' opinions that Claimant was capable of medium work; and Dr. Gonzalez-Mendez's opinion that Claimant was limited to light work. (Id. at 9-10) The ALJ explored all of the key evidence, weighed the medical opinion evidence as well as Claimant's testimony and subjective complaints and determined Claimant was limited to a medium RFC based upon the substantial evidence of record. (Id. at 11) The ALJ explained why he gave Dr. Gonzalez-Mendez's opinion only some weight, noting it was not consistent with the imaging in the record, Claimant's activities of daily living, including Claimant's testimony that he was able to lift 50 pounds. (Id. at 11-12)

In sum, the Commissioner contends that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 12)

In reply, Claimant restates that the ALJ did not provide an adequate explanation as to how the effects of his sarcoidosis-related fatigue impacted his ability to concentrate, persist or maintain pace allowing him to perform and sustain work. (ECF No. 14) The lack of explanation frustrates meaningful review and warrants remand. (Id.)

**The Relevant Evidence of Record**[3]

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Medical Evidence:

The record indicates that Claimant had reported to his providers that he experienced fatigue and low energy prior to and consistently since his alleged onset date of July 30, 2015. (Tr. at 301, 305, 345, 403, 408, 409, 588) On September 9, 2015, Claimant was admitted to the ER with complaints of extreme tiredness. (Tr. at 369, 375, 393, 403) Because of his history of thyroid cancer, a CT scan of his chest was ordered which indicated multiple nodules were in both lungs. (Tr. at 393)

In November 2015, Claimant was referred to the Cleveland Clinic because of the pulmonary nodules seen in the CT scan. (Tr. at 426-427) Claimant was then diagnosed with pulmonary sarcoidosis in January 2016. (Tr. at 399) Thereafter, he underwent additional pulmonary function testing on January 14, 2016, on May 12, 2016 (Tr. at 674) and on March 3, 2017 which reflected normal spirometry (Tr. at 528-530).

On May 3, 2016, Claimant presented to the Emergency Department "with complaints of being 'extremely fatigued' and short of breath for the past two weeks. He states this is new for him and he can hardly walk 20 feet or walk around his house without getting extremely tired. Resting does help with his fatigue." (Tr. at 705) A chest x-ray revealed increased interstitial markings throughout both lung fields with subtle vague nodular areas bilaterally. (Tr. at 687, 700) He was assessed with "[n]ew onset atrial fibrillation with rapid ventricular rate" and stated on a Cardizem drip. (Tr. at 706) He was discharged on May 8, 2016 in stable condition, having been prescribed metoprolol 50 mg twice a day and recommended to follow up with his doctor as an outpatient. (Tr.

at 695-696)

Claimant returned to the Cleveland Clinic on May 12, 2016. (Tr. at 497-512) The examiner noted that a March 2016 CT scan of Claimant's chest showed an improvement in his sarcoidosis in comparison to a prior computed tomography (CT) scan from November 2015; it was noted that Claimant had "remained fairly well until a few weeks ago, when he began to experience unusual fatigue" but after his hospitalization earlier in May, he reported some improvement in his fatigue. (Tr. at 497)

On May 13, 2016, Claimant presented to his primary care physician complaining of fatigue, exercise intolerance and lightheadedness; he reported "just walking to the room made him extremely tired." (Tr. at 655) He complained that he had shortness of breath as well and that his symptoms were exacerbated by walking, exercise and stress and that rest relieved those symptoms. (Id.)

On May 24, 2016, Claimant followed up at the Parkersburg Cardiology Associates. (Tr. at 663-666) It was noted that he had been hospitalized for shortness of breath and was diagnosed with paroxysmal atrial fibrillation and that symptoms included "palpitations, fatigue and shortness of breath" but not dizziness, syncope or near syncope. (Tr. at 663) Claimant reported that his symptoms were exacerbated by exercise, but also "good compliance with treatment, good tolerance of treatment and good symptom control." (Id.)

A handwritten note dated June 13, 2016 indicated that Claimant was "very fatigued" and inquired if he was to continue the same dose of Synthroid. (Tr. at 731)

At Claimant's July 15, 2016 shoulder appointment, he reported that his pain was moderate in severity and improving. (Tr. at 643) His symptoms were relieved by rest and ice. (Id.) In October

2016, Claimant reported feeling well with minor complaints. (Tr. at 727) In November 2016, at a re-check of his shoulder, he reported he was unable to do his full workout with weights. (Tr. at 724) It was noted that both fatigue and weight loss were "present." (Tr. at 725, 728) A November 2016 left shoulder x-ray showed mild osteoarthritis. (Tr. at 739)

In November 2016, Claimant's oncologist noted that Claimant was having no new issues and he could return in six months; he reported no complaints. (Tr. at 828-829)

A left shoulder MRI taken on December 15, 2016 revealed a full thickness tear of the supraspinatus tendon with associated muscle atrophy, an anterior acromial hook, and a cyst possibly associated with glenoid labral tears. (Tr. at 736)

On January 12, 2017, Claimant's left shoulder MRI revealed a full thickness tear with retraction and muscle atrophy. (Tr. at 792) The orthopedist indicated that the tear was likely not operable given the retraction and atrophy. (Tr. at 793) Claimant denied any pain since having a recent shoulder injection. (Tr. at 791) The next day at his primary care provider, Claimant reported an onset of left shoulder pain that began four months earlier when he was lifting weights, as well as fatigue and weight loss. (Tr. at 762) He denied back and muscle pain. (Id.) When he returned on January 30, 2017 to check his blood pressure, Claimant reported his "heart pill" had been cut in half two weeks prior and that he felt more fatigued than usual; he "reports he just came from the gym where he lifted weights and walked inclined for 3 miles." (Tr. at 760)

On March 2, 2017, Claimant was seen at the Cleveland Clinic and he continued to complain of having no energy; he reported that he started to go back to the gym and walks for an hour and that he used to be able to walk the golf course, though he can walk around the house better. (Tr. at 513) He also reported that he was "struggling getting through work [and] considering an early

9

retirement," particularly that by 1:00 p.m. "he is struggling at work." (Id.) The possibility of using an antifatigue medication was discussed, however, Claimant was "hesitant to add more medications." (Tr. at 519)

On May 9, 2017, Claimant presented at Parkersburg Cardiology Associates, Inc. to transition his care to another physician. (Tr. at 808) It was noted that he was diagnosed with paroxysmal atrial fibrillation and that symptoms included "palpitations, fatigue and shortness of breath" but not dizziness, syncope or near syncope. (Id.) Claimant reported that his symptoms were exacerbated by exercise, but also "good compliance with treatment, good tolerance of treatment and good symptom control." (Id.) He also reported that he had been working out at the gym and it was noted that he was "stable from a cardiac standpoint" and that he had "been working out at the gym for months and is feeling much better." (Tr. at 810) Because his blood pressure remained so low, they were considering discontinuing his blood pressure medication altogether. (Id.) Also in May, Claimant's oncologist reported that there was no evidence for disease recurrence. (Tr. at 831) In July 2017, Claimant reported feeling well with minor complaints, though experiencing palpitations and fatigue related to his atrial fibrillation. (Tr. at 753) He requested a shoulder injection. (Id.) On November 9, 2017, Claimant returned to the Parkersburg Cardiology Associates without any complaints except for chronic fatigue from his sarcoidosis. (Tr. at 816) Also in November 2017, Claimant's oncologist stated that Claimant could be followed annually. (Tr. at 834)

Medical Opinion Evidence:

On January 14, 2016, Christian Nasr, M.D. evaluated Claimant and offered an Eastern Cooperative Oncology Group performance status of "0," consistent with Claimant being fully active and able to carry out all pre-disease performance without restriction. (Tr. at 406)

On April 7, 2016, State agency physician Atiya Lateef, M.D. opined that Claimant remained capable of performing medium work with additional environmental limitations. (Tr. at 112-114) On May 23, 2016, State agency physician Fulvio Franyutti, M.D. concurred with Dr. Lateef's opinion. (Tr. at 122-123)

On January 9, 2018, State agency physician Jose Gonzalez-Mendez, M.D. opined that Claimant would be limited to light work with postural and manipulative limitations. (Tr. at 795-802)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant explained that after his thyroid was removed due to cancer, he was diagnosed with sarcoidosis. (Tr. at 90-91) Claimant testified that his symptoms related to sarcoidosis is chronic fatigue; he has difficulty mowing his tiny yard as well as standing for half an hour to forty minutes, he gets very tired and will sit down or go to sleep. (Tr. at 91) Claimant takes naps during the day. (Tr. at 91-92) Claimant also developed neuropathy where his feet feel like they are asleep all the time which was caused by the steroids to treat his sarcoidosis; he stated that it affects his balance. (Tr. at 96)

Sometime in 2016, Claimant developed a torn rotator cuff in his left shoulder which makes it hard to lift his arm above his head, such as combing his hair, so he combs his hair with his right

hand. (Tr. at 92) He admitted that he could lift a gallon of milk with his left arm, however, he cannot hold out to his side. (Id.) He cannot lift a case of pop or water with his left hand. (Tr. at 93)

Claimant testified that he could not return to work because he could only do so for about thirty to forty minutes at a time due to fatigue. (Tr. at 93-94) He guessed that he could walk on a flat surface for about an hour at a "nice and easy pace", and that he could probably stand for about an hour, but he had no trouble sitting down for a long time. (Tr. at 94) Claimant estimated that he could lift about fifty pounds with both arms, but not repeatedly throughout the course of the day. (Tr. at 95) He testified that he could not lift and carry weight for eight hours, which is substantially different from where he was in 2013. (Id.)

Claimant stated that he works out at the gym by walking on the treadmill which his doctor recommended to build his stamina because of his fatigue; he also does weight-lifting exercises to for his left shoulder. (Tr. at 97) He cannot have corrective surgery on this shoulder because the muscle had died. (Tr. at 98)

To pass the time, Claimant testified that he watches a lot of TV and will go sit out on the porch and will sometimes go walk around the city park when its nice out. (Id.) He is unable to clean his house all at once, but he tries to keep busy as he can. (Tr. at 98-99) He takes naps during the day and he gets worn out very quickly. (Tr. at 99)

Patricia McMann, Vocational Expert ("VE") Testimony:

In response the following hypothetical, an individual of Claimant's age, educational background and work experience capable of performing medium work but limited to frequent reaching in all directions including overhead with the left arm; limited to climbing ramps and stairs occasionally and never climbing ladders, ropes or scaffolds; frequent kneeling and crouching and

occasionally crawling; with occasional work at unprotected heights or frequent work around moving mechanical parts; occasional work in humidity and wetness and frequent dust, odors, fumes and pulmonary irritants; and extreme cold or heat occasionally, the VE testified that such an individual could perform work including assemble occupations (DOT #806.684-010), a laundry laborer (DOT #361.685-018), and a store laborer or stocker (DOT #722.687-058). (Tr. at 101-103) In response to what the threshold is for when such an individual would be unemployable if off task due to fatigue, the VE stated when it reaches 15 percent of the time and that it would depend upon the employer and the nature of the work. (Tr. at 103)

In response to Claimant's representative, the VE testified that if the hypothetical individual were limited to light work, then the individual would not be capable of performing the past relevant work. (Tr. at 103-104)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

13

their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4ᵗʰ Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

### Evaluation of Opinion Evidence:

Because Claimant takes issue with the ALJ's evaluation of the opinion evidence provided by Dr. Gonzalez-Mendez, as a practical matter it is best to review how the SSA governs the criteria for evaluating opinion evidence prior to addressing the ALJ's RFC assessment; per 20 C.F.R. § 404.1527(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations further state that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." Id. § 404.1527(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." Id. § 404.1527(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational

factors" are determinations reserved solely to the Commissioner. Id. § 404.1527(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. § 404.1527(d)(3).

In his review of the evidence, the ALJ noted that while Claimant's degenerative joint disease of the left shoulder did not meet or equal Listing requirements, Claimant's January 2017 MRI "revealed a full thickness tear of the supraspinatus with 3cm of retraction and atrophy of the muscle." (Tr. at 41, 792) The ALJ further noted that physical examinations indicated Claimant had mild localized tenderness and a positive impingement test on the left. (Tr. at 41) The ALJ acknowledged that although Claimant testified he could mow his lawn, perform household chores, and went to the gym, he has symptoms of fatigue related to his sarcoidosis that interferes with mowing his yard and he takes naps during the day. (Tr. at 41, 42-43) Despite having unsuccessful physical therapy treatment for his left shoulder, the ALJ noted that Claimant has trouble lifting his arm overhead and with combing his hair, but he was not considered a surgical candidate by his doctor. (Tr. at 43) The ALJ further noted that Claimant testified that he could walk for one hour and stand for one hour and had no problems sitting, and that he could lift 50 pounds, though not repeatedly throughout a workday. (Id.) The ALJ mentioned Claimant's activities on an average day consisted of watching a lot of television, sitting on the porch, walks at the park, naps and cleaning part of his house and that "[h]e tries to keep busy." (Id.) The ALJ acknowledged that Claimant thought of completing his degree but did not think he had the energy and that he works out at the gym to help his fatigue and stamina, which included walking on the treadmill and working on weight machines to exercise the muscles in his shoulder. (Id.)

With regard to the medical evidence concerning sarcoidosis, the ALJ noted that after his diagnosis in January 2016, Claimant received pulmonary function testing on January 14, 2016, May 12, 2016 and March 3, 2017 that were normal (Tr. at 43, 360, 528-530, 674), and that a May 3, 2016 chest x-ray (Tr. at 43, 687, 700) indicated that his sarcoidosis had improved since an earlier CT scan taken in November 2015 (Tr. at 43, 497). The ALJ noted that on March 2, 2017 that Claimant was seen at Cleveland Clinic and that he complained of having little energy, but endorsed that he could walk for an hour at the gym, and that "[o]ddly, he reported that he was 'struggling getting through work, (and he was) considering early retirement.' " (Tr. at 43, 513) The ALJ further noted that on May 9, 2017 Claimant reported he had been working out at the gym for months. (Tr. at 43-44, 808-810)

Regarding the medical evidence concerning Claimant's left shoulder deficits, the ALJ noted that an x-ray taken on November 22, 2016 showed mild osteoarthritis (Tr. at 44, 739), but a subsequent MRI on December 15, 2016 revealed a full thickness tear of the supraspinatus tendon with muscle atrophy (Tr. at 44, 736). It was noted that Claimant complained of the onset of pain in his left shoulder four months earlier while lifting weights during an appointment in January 2017. (Tr. at 44, 762) Another MRI in January 12, 2017 revealed a full thickness tear, with an additional 3cm retraction and atrophy of the muscle, which was deemed irreparable by an orthopedist. (Tr. at 44, 790-793) The ALJ noted that Claimant testified that he participated in physical therapy afterwards, however, the records did not show any significant care beyond that, including no pain medication for the left shoulder according to Claimant's medications form. (Tr. at 44, 299-300)

From this evidence, the ALJ determined that the medium RFC assessments provided by the State agency consultants, Drs. Lateef and Franyutti, were entitled to "significant weight" because their opinions were "based on the consistency of their opinions with the medical evidence of record including physical examinations (Tr. at 45, 394, 404-408, 415, 828, 834)[4], objective findings (Tr. at 45, 363, 582, 687, 700, 701)[5], the claimant's diagnoses of sarcoidosis (Tr. at 45, 399), and obesity (Tr. at 45, 581, 834); however, the claimant is more limited due to issues (and imaging) with his left shoulder (Tr. at 45, 736, 739, 790-793)." Given the inoperable rotator cuff tear, the ALJ deemed Claimant more limited. (Tr. at 45, 790-793)

With respect to Dr. Gonzalez-Mendez's opinion, the ALJ noted that upon his review of the evidence, Dr. Gonzalez-Mendez found Claimant's impairments limited him to light exertional work, and specifically that Claimant would be limited to frequent overhead reaching with the left upper extremity. (Tr. at 45-46, 795-803) The ALJ gave the opinion "some weight", stating that "limiting the claimant to light is simply not supported by imaging in the record (Exhibits 6F/205, 208, and 259-262)[6], the claimant's activities of daily living (Exhibits 5E, 6E, 6F/81, 9F/4-6, and Testimony)[7], and his own statement of an ability to lift 50 pounds (Testimony)." (Tr. at 46)

---

[4] The cited Exhibits include: a follow up examination performed by Sivamurthy Kyathari, M.D. of the Camden Clark Medical Center concerning Claimant's thyroid cancer treatment on September 17, 2015; treatment notes from the Cleveland Clinic dated January 14, 2016 and December 16, 2015; and follow up examinations by Dr. Kyathari on November 16, 2016 and November 28, 2017.

[5] These Exhibits concern: the November 5, 2015 chest x-ray; a November 24, 2015 Cleveland Clinic treatment note concerning the data review of imaging and scanning performed to date; the May 8, 2016 discharge summary from Camden Clark Medical Center concerning the chest x-ray taken on May 3, 2016; and the May 3, 2016 x-ray and May 4, 2016 echocardiogram.

[6] These exhibits concern office treatment records from Mid-Ohio Valley Medical Group, including the report concerning the December 2016 MRI confirming full thickness tear across the supraspinatus tendon with tendon retraction and moderate atrophy of the supraspinatus muscle (Tr. at 736), the November 22, 2016 x-ray of Claimant's left shoulder revealing mild osteoarthritis (Tr. at 739), and the January 12, 2017 office note confirming the complete tear of the rotator cuff tendon being irreparable (Tr. at 790-793).

[7] This citation refers to Claimant's Function Reports dated February 16, 2016 and March 10, 2016 (Tr. at 253-260, 261-268), an office record dated July 7, 2015 at the Endocrine and Diabetes Center when Claimant was seen for possible thyroid nodule and it was noted he exercised "3-4 times per week" (Tr. at 612), and a May 9, 2017 office

As discussed *supra*, the RFC assessment limits Claimant to frequent reaching in all directions, including overhead with the left arm. This is consistent with the finding by Dr. Gonzalez-Mendez. Though the ALJ's RFC limited Claimant to medium work, as opposed to light work, the ALJ specifically noted the specific records that supported this finding, including the opinions provided by two other State agency physicians, and significantly, Claimant's own testimony that he could lift 50 pounds; this evidence was consistent with the medium RFC determination. Moreover, the ALJ specified why he did not assign more than "some" weight to Dr. Gonzalez-Mendez's opinion: the imaging in the record, Claimant's activities of daily living and his own testimony. In short, although the undersigned agrees with Claimant that an adjudicator is required to explain why certain limitations opined by a medical expert were not adopted, the limitations noted by the medical sources are not inconsistent with those accounted for in the ALJ's RFC assessment. In this case, the ALJ rendered an RFC that was generally consistent with the limitations noted by the State agency medical consultants. Because the evidence and resultant RFC are not "materially" inconsistent or ambiguous, the application of Social Security Ruling 96-8p requiring an ALJ to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved" has not been sufficiently triggered.

Nevertheless, the ALJ provided "good reasons" for discounting Dr. Gonzalez-Mendez's opinion and provided an adequate explanation for same allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). The record of evidence on the whole does not suggest that the ALJ merely selected trivial or insignificant inconsistencies "[b]y relying

---

note when Claimant was transitioning into care at the Parkersburg Cardiology Associates, Inc. where it was noted that Claimant "has been working out at the gym for months and is feeling much better" and "if his BP remains low may consider discontinuing it" (Tr. at 808-810).

on these limited observations to discredit the treating source opinions . . . while overlooking the record's broader import . . . ."[8] It is clear that the ALJ considered the other medical opinion evidence of record, the medical records and treatment notes themselves, in addition to the other evidence of record, specifically Claimant's own statements and testimony (Tr. at 42-46). In short, the ALJ provided the necessary narrative in his determination that Dr. Gonzalez-Mendez's light RFC assessment was entitled to "some" weight.

Accordingly, the undersigned **FINDS** the ALJ's evaluation of Dr. Gonzalez-Mendez's RFC assessment is supported by substantial evidence.

Claimant's RFC Assessment:

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

---

[8] Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018); Testamark v. Berryhill, 736 F. App'x 395, 398-399 (4th Cir. 2018).

19

At step two, the ALJ found sarcoidosis to be a severe impairment. However, Claimant contends that the ALJ failed to explain how his chronic fatigue would allow him to perform sustained work activities in an ordinary work setting on a regular and continuing basis, thus failing to provide an explanation in the RFC assessment. (ECF No. 10 at 6) At step three, the ALJ specifically found that Claimant's sarcoidosis did not meet Listings requirements because Claimant did not require three hospitalizations within a 12-month period, noting that three pulmonary function tests were normal. (Tr. at 41) The ALJ acknowledged Claimant's testimony that his sarcoidosis caused him to have "related symptoms of fatigue", that he had problems mowing his yard and that he needed to take naps during the day. (Tr. at 42-43)

As noted *supra*, the ALJ discussed Claimant's testimony, which confirmed that he could walk and stand for one hour, lift 50 pounds, though not repeatedly throughout a workday, and that on an average day, he watched a lot of TV, sits on his porch, walks at the park, naps, cleans part of his house, and goes to the gym to help with his fatigue and stamina, which included walking on the treadmill and lifting weights. (Tr. at 43)

In his examination of the objective evidence of record, the ALJ discussed the evidence that indicated Claimant was not as limited as he alleged: in July 2015 he reported exercising 3-4 times per week (Tr. at 44, 612); in September 2015 he complained of cough and mild expectoration to his oncologist, but on physical examination his lungs were clear to auscultation (Tr. at 44, 394); in November 2015, he had normal breath sounds and his physical examination was unremarkable (Tr. at 44, 415). The ALJ also noted that in January 2016 at the Cleveland Clinic, Claimant "complained of low energy, mild shortness of breath with gradual, progressive onset, persistent cough ongoing for four months but no chest pain or discomfort. He endorsed increased fatigue

over the last few days; however, his physical examination . . . was normal." (Tr. at 44, 404-408) By November 2016, he returned to his oncologist with "no complaints" and both his physical examination and lab results were normal. (Tr. at 44, 828) The ALJ again noted that in November 2017 oncology records indicated a normal physical examination. (Tr. at 44-45, 834)

Next, the ALJ returned to Claimant's activities of daily living:

The claimant self-reported that he had no problems maintaining hygiene and grooming. He described that he watched television, watched movies, dined out with friends, cooked, spent time on the computer, did laundry, cleaned his house, napped, drove, and shopped for groceries. He reported that he mowed grass and used a weed eater but with some difficulty. He played golf, but not often. He shared that he regularly spent time at the gym, did some walking, (on the treadmill 3-4 days a week) and lifted light weights (Exhibits 5E and 6E)[9]. At the hearing, the claimant testified that he could lift up to 50 pounds.

Afterwards, the ALJ found that the "collective record including the objective evidence, imaging, physical examination findings, and the claimant's self-reported activities of daily living and testimony establish that he is capable of working" within the parameters of the RFC limiting him to medium work. (Tr. at 45) After having evaluated the opinion evidence of record, particularly those opinions outlined *supra*, the ALJ found that "the evidence of the claimant's daily activities along with the objective medical evidence . . . establishes that he has greater sustained capacity than alleged." (Tr. at 46)

There is no dispute that Claimant's allegations concerning chronic fatigue is corroborated by the relevant medical records. There is also no dispute that the record lacks any medical opinion that Claimant's fatigue is disabling or prevent him from completing an eight-hour workday. Although Claimant reported that he experienced chronic fatigue that was "exacerbated by

---

[9] These exhibits concern Claimant's function reports submitted on February 16, 2016 and March 10, 2016, respectively. (Tr. at 253-260, 261-268)

exercise" (Tr. at 808), he also reported that "[h]e has been working out at the gym for months and is feeling much better." (Tr. at 810)[10] [11] Though "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)), it is necessary that an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ's failure to mention every notation from the record that documented Claimant's complaints of fatigue is without error, because the ALJ acknowledged Claimant's own statements concerning fatigue and recognized that this complaint was corroborated by the medical record. Nevertheless, Claimant's subjective complaints of fatigue as well as his endorsement of walking for an hour on a treadmill and working out with weights at the gym three to four times per week are matters concerning conflicting evidence of record that is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that he can work at medium exertional levels for an eight-hour workday, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the "collective record" that included objective evidence, imaging, physical examination findings as well as Claimant's own statements and testimony, that Claimant remained capable of medium work despite his ongoing complaints of fatigue provided

---

[10] This is from a treatment note dated May 9, 2017 from Parkersburg Cardiology Associates.
[11] Claimant has asserted that the ALJ did not mention numerous other instances in the medical record where Claimant had complained of fatigue, low energy and generalized weakness (ECF No. 10 at 8-9); this is one of those instances.

sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637.

In sum, the undersigned **FINDS** the RFC assessment with respect to Claimant's sarcoidosis-related fatigue is supported by substantial evidence.

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant is not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for remand (ECF No. 10), **GRANT** the Defendant's request to affirm the decision below (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 15, 2019.

Omar J. Aboulhosn
United States Magistrate Judge